# IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| JAMES MICHAEL KELLER, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 2:19cv207-MHT |
| HYUNDAI MOTOR ) | (WO) |
| MANUFACTURING, ) | |
| ) | |
| DEFENDANT. ) | |

## PRETRIAL ORDER

A pretrial conference was held in the above case on **January 20, 2021** wherein the following proceedings were held and actions taken:

1.     <u>PARTIES AND TRIAL COUNSEL</u>:

   For Plaintiff, James Michael Keller:

   Julian McPhillips
   Chase Estes
   K. David Sawyer
   McPhillips Shinbaum, L.L.P.
   _____

   For Defendant, Hyundai Motor Manufacturing Alabama, LLC ("HMMA"):

   Michael L. Lucas
   Meryl Cowan
   BURR & FORMAN, LLP
   _____

44835143 v2

COUNSEL APPEARING AT PRETRIAL HEARING:

For Plaintiff, James Michael Keller: same as trial counsel.

For Defendant, Hyundai Motor Manufacturing Alabama, LLC ("HMMA"): same as trial counsel.

2. JURISDICTION AND VENUE.

(a) The court has subject matter jurisdiction of this action under 28 U.S.C. §1331.

(b) All jurisdictional and procedural requirements prerequisite to maintaining the action described in (a) have been met.

(c) Personal jurisdiction and/or venue are not contested.

3. PLEADINGS: The following pleadings[1] and amendments were allowed:

Complaint (ECF No. 1)
Answer to Complaint (ECF No. 6)
Amended Complaint (ECF No. 48)
Answer to Amended Complaint (ECF No. 54)

4. CONTENTIONS OF THE PARTIES.

(a) Plaintiff's Contentions: The Plaintiff, Mr. Keller expects to produce the following evidence at trial: (1) age, in violation of 29 U.S.C. § 621 et seq.

Age:

Mike Keller was born in 1967, and hired by Hyundai in the year 2004, although production at the Montgomery plant did not begin until 2005. During this time, Mr. Keller was involved in a vast amount of training in the mechanical end as well as leadership courses. In addition, Mr. Keller's photograph was included in two *Time* magazine articles about Hyundai, the first on April 25, 2005, the second on

---

[1] The parties have listed all allowable pleadings pursuant to Fed. R. Civ. P. 7(a).

June 27, 2005. During his 14 year and 3 months of employment at Hyundai, Mr. Keller had a perfect attendance record and was arguably its most productive employee ever. Moreover, his record was clear of any corrective action issues.

Mr. Keller completed more projects than any of the 98 other group leaders. As a result, Hyundai allowed more project funds to be devoted to Keller's projects, due to his proven track record as an effective group leader. Mr. Keller also assisted Hyundai in achieving a cost savings total of approximately $164,950.00 by the end of November 2011. Since that time, Mr. Keller completed other projects for Hyundai, saving Hyundai hundreds of thousands, including inventing a jig fixture, which improved a "parts transfer" in the 5,400-ton presses at the idle nest.

Mr. Keller's annual performance evaluations with Hyundai were excellent. In Mr. Keller's 2016 evaluation, supervisor Daryl Sanders stated:

> "Mike is a well rounded Group Leader with a lot of knowledge about Stamping Production… He is a valuable asset to HMMA for sure and I look forward to him passing his knowledge over to others."

(2016 Annual Performance and Competency Evaluation, attached as Exhibit 1).

In the same evaluation, Mr. Keller received an overall rating of "meets expectations" and individual ratings of "exceeds expectations" for his performance appraisal rating and job competency assessment. Mr. Keller received "meets expectations" on his core competency assessment and leadership competency assessment. In Mr. Keller's 2017 performance evaluation, Mr. Sanders stated:

> "Mike is a very knowledgeable Group Leader, that is always willing to lend a hand when necessary. I would like Mike to not only share his knowledge but be more willing to engage with TM to ensure that Department Policy and Procedure are enforced."

(2017 Annual Performance and Competency Evaluation, attached as Exhibit 2).

In the same evaluation, Mr. Keller received an overall mid-year rating of "meets expectations" and individual ratings of "meets expectations" for his core competency evaluation, leadership competency evaluation, and job competency evaluation.

On March 8, 2018, when Keller arrived at Hyundai, he was informed that Hyundai was terminating his employment that day.

Mr. Keller then inquired several times about why he was being terminated. His supervisor and Head of the Department, Mike McCabe, answered that he did not know why Keller was chosen **but it was not because of a work performance issue**.

Hyundai denies that Mr. Keller's age was ever considered when it selected him for termination. Yet it was not until 22 months after Mr. Keller's termination that Hyundai officials first came up with an alternative explanation at depositions that Hyundai terminated Mr. Keller for leadership and morale issues related to union sympathizers. Yet pro-union sympathies were also exhibited on the shift of Mr. Keller's comparator, Bill Carter, the sole other group leader in the stamping shop, only 37 years old at the time of Mr. Keller's termination. Further, Mr. Carter had serious disciplinary issues during his tenure at HMMA. Also, in his group leaders' job, Mr. Keller was replaced by a much younger Zack Morris, age 37 at the time, and approximately 13 years Mr. Keller's junior. HMMA vice president Chris Susock admitted his leadership in Mr. Keller's termination, and admitted Mr. Morris lacked the technical expertise of Mr. Keller.

Mr. Keller was one of 21 Hyundai employees selected for termination as the result of this March 8, 2018 corporate restructuring. The composition of the Hyundai employees terminated as a result of the so-called restructuring consisted of 10 specialists, 2 group leaders, 6 assistant managers, and 3 managers. No group leaders under the age of 40 were terminated, whereas 2 group leaders, one being Mr. Keller, over the age of 40 were terminated.

Of the 371 specialists employed by Hyundai at that time, 242 specialists, or 65% were under the age of 40 years old, while 129 specialists, or 34%, were 40 years or older. Of the specialists terminated, 7 were age of 40 or older, whereas only 3 were under the age of 40. Group leaders under the age of 50 or older were only 38 out of 98, and the two group leaders terminated in the March 8, 2018 so-called "reorganization" were Mike Keller, 50, and Mark Leroy, 49. Of the 101 group leaders employed at Hyundai, including Mr. Keller at the time of his termination, 33 group leaders, or 33%, were under the age of 40 years old, while 68 group leaders, or 67%, were 40 years or older.

This same trend existed for the individuals selected for termination as assistant managers and managers in the company as a whole during the same time period in 2018. Of the 104 assistant managers employed at Hyundai, 40 assistant managers, or 38%, were under the age of 40, while 64 assistant managers, or 62%, were 40 years or older. No assistant managers under the age of 40 were terminated, but 6 assistant managers over the age of 40 were terminated. Finally, of the 48 managers employed at Hyundai, 9 managers, or 19%, were under the age of 40, while 39

managers, or 81%, were 40 years or older. No manager under the age of 40 was terminated, whereas 3 managers over the age of 40 were terminated.

The pretextual nature of the reasons given by Hyundai for terminating Mr. Keller are numerous, reflected in the 25 affidavits of co-employees, many still working at Hyundai. Virtually everyone praises Mr. Keller's leadership skills, knowledge of the job and especially his high morale maintenance.

Mr. Keller also disagrees with the accuracy of the PDR scores attributed to him in Hyundai's contentions and brief, and says his true PDR score for 2017 was higher than listed, and did not include complete information, leaving out comments and numbers, that were complimentary to him.

Yet Hyundai replaced Mr. Keller with a 37-year-old man approximately 13 years Mr. Keller's junior. Chris Susock, Vice President of Production, and co-decision maker on the termination of Mr. Keller, stated that Mr. Morris was selected "for his leadership abilities," and that "it was apparent that [Mr. Keller's] leadership skills were ineffective and were not capable of performing the duties or the expectations of the stamping operation department." Yet there had never been any indication in Mr. Keller's performance reviews that his leadership skills were lacking. Another pretext.

Co-decision maker Craig Stapley stated "it was evident that there were a lot of morale issues in that group" and he decided to hire Mr. Morris because his military leadership experience was "what [Stapley] needed in the stamping plant." Yet Mr. Keller also came from a strong military background, and no complaints about Mr. Keller's leadership abilities were ever listed in his 2016 or 2017 performance reviews. Most significantly, at least 25 of Mr. Keller's co-workers and subordinates believed he was an effective leader in maintaining good team morale.

In his Brief in Opposition to Summary Judgment, Mr. Keller sets forth a prima facie case of age discrimination under the ADEA against Hyundai, showing he was a member of a protected group, terminated from his position, and replaced by someone younger, and less qualified. Mr. Keller was actually highly qualified for his position and says Hyundai's preferred reason for his termination was pretextual. As reflected by the foregoing, Mr. Keller insists that younger Hyundai employees were treated more favorably than him, that he was an effective leader and maintained good morale, and Hyundai routinely discriminated against older employees in employment decisions.

Hyundai's expert's testimony was flawed by her own admission that it should not be used as evidence at trial.

Finally, Mr. Keller's brief cited ample case law, showing that the "but for" causation standard for ADEA does not require that age discrimination be the sole cause under settled law.

(b)  <u>Defendant's Contentions</u>: HMMA is an equal opportunity employer who precludes discrimination on the basis of age, among other reasons, and HMMA also respects its team members' Section 7 rights, does not interfere with those rights, trains its managers and group leaders regarding positive labor relations, and respects its team members' right to make their own decision regarding union representation. HMMA has a published, lawful position on unions and expressly forbids any managerial-level employee from violating a team members' protected Section 7 rights or engaging in unlawful discrimination. Plaintiff never once raised concerns of age discrimination or retaliation for engaging in protected Section 7 activity (or any other concerns about discrimination or mistreatment of any kind) during his employment at HMMA.

At all relevant times, Plaintiff was a salaried Group Leader (the equivalent of a front-line supervisor and the first level of management at HMMA) in the stamping shop at HMMA. Throughout his employment, hourly team members in the stamping shop reported directly to Plaintiff, and he was responsible for managing and leading his direct reports. Plaintiff was the weakest performer and leader in the Stamping Department, as reflected by his consistently low annual performance appraisal ("PMR") scores since 2013. In the stamping shop, prior to the corporate reorganization, there were just two Group Leaders, Plaintiff and Billy Carter ("Carter").  Plaintiff's and Carter's PMR scores were as follows:

| PLAINTIFF | CARTER |
|---|---|
| 2013 – 3.10 | 2013 – 3.50 |
| 2014 – 3.25 | 2014 – 3.42 |
| 2015 – 3.35 | 2015 – 3.39 |
| 2016 – 3.03 | 2016 – 3.42 |
| 2017 – 3.00 | 2017 – 3.44 |

HMMA's policy on third parties became particularly relevant in 2015 and 2016 when HMMA was the focus of open and obvious union organizing activity – especially in Plaintiff's area.  During this period, HMMA increased its expectations of Group Leaders and specifically requested that each Group Leader meaningfully engage with his/her team members respecting HMMA's published policy on third parties.  Plaintiff admits that HMMA conducted regular management training on the topic of third party representation, but he conceded "most of the time [he] didn't – [he] didn't make it."  Plaintiff admitted he should have talked to his team members and convey HMMA's position on third parties. Plaintiff admitted that his management expected Plaintiff to talk to team members and to explain to them that HMMA did not feel its team members need a union. Plaintiff, however, recalls only communicating one time with his team members as a group and only speaking with one of his team members on this topic. Plaintiff's failure to engage with his subordinates demonstrated a lack of leadership. HMMA never precluded anyone from doing anything to join or support a labor union, never mistreated any team member who was in favor of the union, and never instructed Plaintiff (or anyone else) to do anything wrong or unlawful towards team members in favor of the union.

In early 2018, HMMA faced a significant decrease in customer demand and sales. As a result, HMMA implemented various cost reduction strategies, including reducing the daily work hours of hourly team members and implementing non-production days. In order to further improve efficiency, Robert Burns, Vice President of Human Resources, Administration, decided to implement a company-wide corporate reorganization for salaried team members.  Plaintiff's employment (along with twenty other salaried team members) with HMMA was terminated on March 8, 2018 as part of HMMA's corporate reorganization. Plaintiff was 50 years of age at that time.  Chris Susock, the manager who selected Plaintiff for inclusion in the corporate reorganization was 54 years of age at the time, and his decision was approved by Robert Burns, who was 56 years of age at the time. Susock stated, in brief, his reasons for selecting Plaintiff:  "[l]owest P[M]Rs for Stamping Group Leaders since 2012, not self-sufficient, requiring constant supervision, lacks respect from his subordinates."  Susock explained that the respect criteria primarily related to the fact that Plaintiff had a substantial number of pro-union team members in his group which demonstrated to HMMA that Plaintiff was not providing leadership to his team members and was too afraid to engage with them.

There were 98 team members who were Group Leaders at the time of Plaintiff's departure from the company. Some notable statistics related to the age of those Group Leaders include the following:

- 72 of the 98 team members who were Group Leaders at the time of Plaintiff's departure are age 40 or above.
- 51 of the 98 team members who were Group Leaders at the time of Plaintiff's departure are age 45 or above.
- 38 of the 98 team members who were Group Leaders at the time of Plaintiff's departure are age 50 or above.
- 18 of the 98 team members who were Group Leaders at the time of Plaintiff's departure are age 55 or above.
- 4 of the 98 team members who were Group Leaders at the time of Plaintiff's departure are age 60 or above.
- **27 of the 98 team members who were Group Leaders at the time of Plaintiff's departure <u>are older than Plaintiff</u>.**

Dr. Carole M. Amidon, a labor economist with a Ph.D. in Economics who has served as an expert witness in approximately 150 employment law cases, conducted an analysis in accordance with generally accepted scientific principles, and she concluded there was no statistically significant differences in the rate in which team members of age 40 and over were subject to the corporate reorganization for the Group Leader position.

Since his termination of employment, Plaintiff has run his own business raising bees and selling honey, and he earned around $50,000 in 2019 alone from his business. Plaintiff has failed to mitigate his damages, and therefore, his right to recovery should be barred accordingly.

All employment decisions concerning Plaintiff were based on legitimate, non-discriminatory, non-retaliatory reasons. Plaintiff's age had nothing to do with – and was not the "but for" cause – of his termination of employment at HMMA.

To the extent Plaintiff has taken a position in another forum that is inconsistent with his position in this forum, his claim is barred by collateral estoppel, issue preclusion, and/or any other applicable equitable defenses.

5. <u>STIPULATIONS BY AND BETWEEN THE PARTIES</u>:

Stipulated Facts:

- HMMA, operates an automobile manufacturing facility in Montgomery, Alabama that produces the Hyundai Sonata, Sante Fe and Elantra automobiles.

- Plaintiff was born in 1967.

- Plaintiff was hired at HMMA on January 5, 2004 as a production worker in the stamping shop.

- Approximately one year later, Plaintiff became a Team Leader and subsequently Plaintiff was promoted to Group Leader in the stamping shop.

- Group Leaders are the equivalent of front-line supervisors.

- Plaintiff's employment with HMMA ended as of March 8, 2018.

- Plaintiff was 50 years of age at the time of his termination.

\* \* \*

It is ORDERED that:

(1) The jury selection and trial of this cause, which is to last 2-5 days, are set for March 15, 2021, at 10:00 a.m. at the United States Courthouse in Montgomery, Alabama;

(2) A trial docket will be mailed to counsel for each party approximately two weeks prior to the start of the trial term;

(3) Each party shall have available at the time of trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk), three copies of the

exhibit list and a sufficient number of copies of each photostatically reproducible exhibit for opposing counsel, the courtroom deputy clerk, the law clerk, the jurors, and the judge to each have a set of the exhibits;

(4) Trial briefs ((a) summarizing the evidence to be presented at trial, (b) setting forth the elements of each and every claim and defense at issue and how the evidence does or does not satisfy those elements, and (c) addressing any evidentiary issues that may arise at trial) are required to be filed by March 1, 2021;

(5) All deadlines not otherwise affected by this order will remain as set forth in the uniform scheduling order (doc. no. 14) entered by the court on May 9, 2019, as amended; and

(6) All understandings, agreements, deadlines, and stipulations contained in this pretrial order shall be binding on all parties unless this order be hereafter modified by order of the court.

DONE, this the 22nd day of January, 2021.

/s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**